BANK OF LYONS, Plaintiff-Appellant, *v.* ALVIN A. SCHULTZ, *et al.*, Defendants.—(MARY SCHULTZ, Defendant-Appellee.)

(No. 54602;

First District—September 10, 1971.

496

Hoffman & Davis, of Chicago, and Crowley, Sprecher, Barrett & Karaba, of Chicago, for appellant.

Edward J. Barrett, of Chicago, for appellees.

Mr. PRESIDING JUSTICE ENGLISH delivered the opinion of the court:

By amendment to a creditor's complaint on a judgment against Alvin Schultz, plaintiff sought to recover from Mary Schultz (hereafter defendant) $24,387.06 which it alleged represented its loss (1) for a personal check drawn by her and credited to her account with the plaintiff bank, but returned by the drawee bank uncollected, and (2) for various cashier's checks issued by plaintiff to defendant with no consideration therefor. At the close of plaintiff's case, the Master in Chancery (to whom this part of a larger complaint was referred) ruled that plaintiff had failed to prove a *prima facie* case. The trial court overruled plaintiff's exceptions to the Master's Report, and entered judgment for defendant, from which plaintiff appeals.

The record discloses very little dispute as to the facts. Defendant, Mary Schultz, and her husband, Alvin Schultz, owned substantially all of the outstanding stock in the Knox Steel and Wire Company, a corporation engaged in the business of manufacturing nails. (Alvin Schultz died prior to the hearing on the portion of plaintiff's suit involved herein.) From 1956 until 1959, defendant engaged herself in the business of Knox, reconciling bank statements, helping to get out merchandise, and

doing general office work. Although she was a professionally trained bookkeeper, she performed no bookkeeping functions for the company. Defendant maintained two checking accounts in her own name, one at plaintiff bank in the name "Mary Schultz, Special Account," and the other at the Oak Park Trust and Savings Bank. She was the only person authorized to sign checks on either of these accounts. Her account at plaintiff bank was for the purpose of paying the bills of Knox. The account at the Oak Park bank was her personal account, but was sometimes used to pay bills of the company. She reconciled the monthly bank statements of both these accounts.

The first part of plaintiff's claim concerns $10,200 credited to defendant's account with plaintiff bank. On August 24, 1956, a check in the amount of $15,000 was deposited in defendant's personal account at the Oak Park bank. Prior to this deposit, her balance in that account had been $129.89. Defendant did not recall making this deposit, nor did she know the origin or purpose of this check, nor the bank on which it was drawn. She later found out that it had been deposited by her husband. On August 29, 1956, the $15,000 check was not honored by the drawee bank, and was charged back against her Oak Park account. She noted this fact in reconciling the August statement of the Oak Park bank. Her notation also bore the initials "H.V.G.," indicating that the check had come from Harry V. Gralnek of Highway Casualty Company.

On August 24 (the same day the $15,000 check had been deposited), a check for $10,200 bearing her signature was drawn on her Oak Park bank account. She acknowledged her signature as drawer, but said she had not typed the amount and payee, and did not know who had. The check was payable to the order of Knox Steel and Wire, Special Account, and on August 25, was deposited in and credited to her account at plaintiff bank, which had been overdrawn by $538.71 immediately prior to the deposit. When the $10,200 check was put through for collection by plaintiff, the Oak Park bank, as drawee, returned the check uncollected, hishonored, and marked N.S.F., apparently due to the dishonor of the $15,000 check referred to above. In the few days after deposit of the $10,200 check, defendant drew checks on the account at plaintiff bank and at the end of August, 1956, her balance in that account was $1,585.65. In an audit at the plaintiff bank almost three years later, it was determined that, although the $10,200 check had been dishonored, it had never been charged back against defendants' account. The facts relating to this check represent the first part of plaintiff's claim, as plaintiff alleges that defendant used the credit allowed for the dishonored check and has never been charged therefor.

Plaintiff's first contention is that the trial court erred in holding that

plaintiff did not establish a *prima facie* case as to the liability of defendant to plaintiff on the check bearing her signature as drawer in the amount of $10,200. In this regard the Master made the following findings of fact (incorporated into the decree by reference), which plaintiff does not dispute, but which it claims entitles it to recovery: (1) The $10,200 check, drawn on defendant's account at the Oak Park bank on August 24, 1956, payable to Knox Steel and Wire Company, was signed by defendant Mary Schultz in blank; (2) The payee's name and amount on the check were typed in after she signed it; (3) Someone other than defendant deposited the check in her account at plaintiff bank, and the sum of $10,200 was credited to her account by plaintiff bank; (4) The check was returned to plaintiff by the Oak Park bank for insufficient funds; (5) At the time of the deposit and return of the check, defendant was unaware of the amount inserted or who deposited the check in her account; (6) Defendant did not know that there were insufficient funds in her Oak Park bank account at the time of issuance or negotiation of the check; (7) When defendant drew checks on her account at plaintiff bank, she did not know that there were insufficient funds in the account; (8) The proceeds of the $10,200 check were used to pay bills of Knox Steel and Wire Co. through checks drawn by defendant against her account at plaintiff bank; (9) Plaintiff failed to give to defendant timely notice of the dishonor of the $10,200 check.

Plaintiff's argument is that, contrary to the trial court's finding that plaintiff had not proved a *prima facie* case, defendant is liable to plaintiff for the $10,200 check under the provisions of the Negotiable Instrument Law which were in effect at the time of the transactions involved herein. Concerning this check, the Master's conclusions of law, adopted by the trial court, were that defendant was not liable because her signature as endorser thereon was a forgery, within the meaning of Section 23 of The Negotiable Instruments Act (Ill. Rev. Stat. 1955, ch. 98, par. 43); and, further, that under Section 102 of the Act (Ill. Rev. Stat. 1955, ch. 98, par. 123) plaintiff was estopped from recovering against defendant as drawer of the check because of its failure to give defendant timely notice of the check's dishonor.

■■ Plaintiff concedes that, under Section 102 of the Act, defendant would not be liable on the check by virtue of the endorsement (forged or not) because she was not given the notice of dishonor necessary to fix liability on a person secondarily liable. Plaintiff argues, however, that as a drawer, defendant is liable on the check, as her liability is discharged only to the extent of her loss, if any, suffered by reason of plaintiff's failure to give her timely notice of dishonor, and that the evidence disclosed

no such loss. Plaintiff cites Section 185 of The Negotiable Instruments Act (Ill. Rev. Stat. 1955, ch. 98, par. 207):

"A check must be presented for payment within a reasonable time after its issue, and notice of dishonor given to the drawer as provided for in the case of bills of exchange, or the drawer will be discharged from liability thereon to the extent of the loss caused by the delay."

Plaintiff also calls our attention to the case of *Heartt v. Rhodes,* 66 Ill. 351, 354, where the court held:

"The want of due presentment, or notice of the dishonor of a check, does not discharge the drawer unless he has suffered some loss or injury thereby."

Granting this proposition, the applicable rule concerning the burden of proof in this regard, is that it rests on the holder of the check to show that the drawer suffered no loss as a result of delay in notice of dishonor. In *Stevens v. Park,* 73 Ill. 387, 389, the court explained the rule and the reason for it:

"Although the holder of the check did not, by the mere act of delay, lose his right of recourse on the drawer, still it was his duty to present the check for payment within a reasonable time, and give notice to the drawer of its dishonor within a like reasonable time; and if he failed to do so, the delay was at his peril. Story on Promissory Notes, § 492. By his omission he assumed the burden of showing that the failure to obtain payment of the check was through no fault of his; and, necessarily, that no damage had occurred to the drawer by his delay. [Citation omitted.]"

(See also *Arnold v. Mangan,* 89 Ill.App. 327, 333, and *Forgan v. Allen Bros.,* 224 N.W. 500, 502 (Iowa).) Further, in *National Plumbing & Heating Supply Co. v. Stevenson,* 213 Ill.App. 49, 54-55, the court restated the rule of the *Stevens* case, quoted above, and affirmed a trial court judgment for the defendant drawer, because the plaintiff holder had failed to present any evidence on the subject of the loss or lack thereof to the drawer.

■■ Plaintiff contends that the above cited cases are inapplicable to the facts of the instant case because they involved a failure of due presentment rather than notice of dishonor, and it argues that there is apparently no case in which a drawer has been shown to suffer loss by a lack of timely notice of dishonor. We recognize that in the instant case due presentment was established, and that, ordinarily, loss due to delay in presentment is readily provable. In Section 185 (quoted above), however, the two situations (delay in either presentment or notice of dishonor) are linked together, and the rule locating the burden of proof is

appropriate to both, since both situations arise from failure of timely action by the holder.

■■ Plaintiff next argues that since defendant drew checks against the full amount of the credit in her account for the dishonored check, she could have had no loss resulting from its failure to give her notice of dishonor; and that plaintiff therefore met its burden of proof. We think this oversimplifies the question of loss caused by delay in notice of dishonor. For example, it is quite apparent in this case that if the $15,000 check which defendant deposited in her Oak Park bank account had been cleared for payment, then the $10,200 check drawn against that account would also have cleared. Without ever having received notice that the $10,200 check had not been honored, defendant was not given a timely opportunity or necessity to attempt a recovery of funds from the drawer of the $15,000 check. As another example of possible loss, if defendant had been given timely notice of dishonor, it might have been possible for her to tap other sources of funds (perhaps her husband) to make good the $10,200 credit she used to pay the company's debts, and, thus, to have insulated herself from potential personal liability. We do not intend to exhaust the possibilities of loss which defendant might have sustained, but only to point out that such possibilities existed and were not negatived by plaintiff's proof.

Under ordinary circumstances, the failure of the $10,200 check to clear would have come to the attention of defendant in the reconciliation of her bank statements, but the circumstances here were not ordinary: she had signed the check, but had no knowledge as to its payee or amount; she did not know the source of all deposits in her account, which was used for "company" purposes; and the check itself was never returned to her. All she could have determined from examining the statements of the two banks was that the check on the Oak Park bank which she had signed in blank had never been charged against that account, from which fact she could reasonably have assumed that it had never been used, had been voided, or had never been presented for payment.

■■ In conclusion on this point, we believe that while the evidence does not show that defendant suffered loss by virtue of plaintiff's failure to give notice of the check's dishonor, neither does it show that defendant suffered no loss thereby. Since plaintiff had the burden of proof, the decision of the trial court must be affirmed, even though, as can be seen, we do not agree with either of the reasons expressed by the trial court for its decision in this regard.

The second part of plaintiff's claim concerns a total of $14,187.06 represented by seven cashier's checks issued by plaintiff to defendant

without any payment therefor. This situation was disclosed when it was discovered that the bank was short funds; that its cashier, Rudolph Belasick, had been fraudulently issuing cashier's checks without the bank's receiving any payment; and that the bank had been honoring the checks out of its general funds. The bank records concerning these checks had been wrongfully removed from the bank. During the audit in April, 1959, to discover the recipients of the bank's funds on these checks, John Kotlar, vice-president of plaintiff, went to the home of Belasick, searched the premises, and found bank records and other documents throughout the house. Among these papers was found the check for $10,200 and the seven cashier's checks involved in the instant case.

The cashier's checks were as follows:

*No. 69452:* Dated August 7, 1956, in the amount of $1,150, payable to defendant, Mary Schultz. It bore a stamped endorsement and was deposited in defendant's account at the Oak Park bank.

*No. 74259:* Dated February 25, 1958, in the amount of $1,800, payable to Alvin Schultz. It was endorsed by defendant and deposited in her account at the Oak Park bank.

*No. 75282:* Dated June 19, 1958, in the amount of $3,000, payable to defendant, Mary Schultz. It was endorsed by her and deposited in her account at the Oak Park bank.

*No. 75283:* Dated June 19, 1958, in the amount of $1,137.06, payable to Alvin and Mary Schultz. It was endorsed by defendant and deposited in her account at the Oak Park bank.

*No. 75285:* Dated June 19, 1958, for $5,000, payable to Alvin and Mary Schultz. It bears an endorsement by Alvin and Mary Schultz, but the name of Mary Schultz, as endorser, was not in her handwriting. The record does not disclose who endorsed this check. Defendant did not recall receiving any of the proceeds, and the check did not go through her bank. This was a credit to the account of the Bank of Lincolnwood, and was so endorsed by that bank.

*No. 75286:* Dated June 19, 1958, in the amount of $1,100, payable to Alvin and Mary Schultz. It was endorsed by defendant and deposited in her account at the Oak Park bank.

*No. 76994:* Dated January 2, 1959, in the amount of $1,000, payable to Alvin Schultz. It was endorsed by defendant and deposited in her account at the Oak Park bank.

Belasick signed all of these checks as cashier, none of which had been properly negotiated through plaintiff bank. There was no record that payment for them had ever been received, or that any account had ever been debited therefor. Defendant testified that she did not recall having

purchased any of the above cashier's checks; that Alvin Schultz had procured them; but that she did not know what funds, if any, he had used.

Belasick was called as a witness by plaintiff, but he was not required to testify when he claimed the privilege against self-incrimination under the Fifth Amendment of the United States Constitution.

Plaintiff's second point on appeal is that the trial court erred in holding that plaintiff did not establish a *prima facie* case against defendant when it showed the use by her of funds represented by six of the seven cashier's checks previously listed. Plaintiff has, in effect, abandoned its claim of right to recover on cashier's check number 75285 in the amount of $5,000 because the evidence established that defendant's signature thereon as endorser was a forgery and that check had not been deposited to her account. Specifically, concerning the remaining six cashier's checks totaling $9,187.06, the trial court concluded that defendant was not liable to plaintiff because she "had no duty to inquire into the circumstances behind the issuance by the Plaintiff of the cashier's checks  *  *  *," and that plaintiff had therefore failed to prove a *prima facie* case. Plaintiff's position is that defendant can properly be permitted to retain the proceeds of these checks only if she meets the burden of establishing that she had the status of a holder in due course, and that the court erred in placing upon plaintiff the burden of showing that defendant had acquired the checks with notice of the fraud committed on the bank in connection with their issuance. In support of this contention, plaintiff cites The Negotiable Instruments Act, Section 59 (Ill. Rev. Stat. 1955, ch. 98, par. 79), which provides in pertinent part: "Every holder is deemed *prima facie* to be a holder in due course; *but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course.*" Emphasis supplied.

A holder in due course is a holder who has taken a negotiable instrument under conditions set forth in the following parts of Section 52 of The Negotiable Instruments Act (Ill. Rev. Stat. 1955, ch. 98, par. 72):

"3. That he took it in good faith and for value.

4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Plaintiff contends that when it showed that the checks were delivered without consideration therefor, a defect in title was demonstrated under section 59 quoted above, and, consequently, defendant should have been required to prove that she or someone under whom she claims, had acquired the checks as a holder in due course.

Defendant replies that the concept of "title" is determined by section 55 of The Negotiable Instruments Act (Ill. Rev. Stat. 1955, ch. 98, par. 75) which provides:

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

Defendant then argues that the record does not show that defendant's title to the cashier's checks was defective. In this regard, defendant misconstrues plaintiff's contention which is not that defendant's title was shown to be defective, but that a prior title was defective, and she had not been shown to be a holder in due course.

■■ When plaintiff's evidence showed the circumstances under which the cashier's checks were issued, and demonstrated that no payment had been received therefor, it did, indeed, establish a prior defective title, and, under the statute (Section 59, *supra*), the burden then fell upon defendant to prove that she, or one under whom she claims, had thereafter acquired title as a holder in due course. See *Bell v. McDonald,* 308 Ill. 329, 334-335; *Traders Investment Co. v. Kalas,* 246 Ill.App. 511, 516-517; and *Hunt v. Green,* 271 Ill.App. 228, 233.

When called by plaintiff as an adverse witness under Section 60 of the Civil Practice Act, defendant's testimony concerning the cashier's checks was as follows:

*No. 69452.* She did not pay plaintiff bank for this check, and did not remember getting it. She was used as a nominee.

*No. 74259.* This check was given her in repayment of funds she had advanced to Mr. Schultz and Knox Steel and Wire. These were funds she had advanced from her personal account over a period of time beginning in 1956. To the best of her knowledge, Mr. Schultz had purchased the check.

*No. 75282.* She did not advance any money to Knox Steel and Wire in payment for this check, nor did she personally pay the consideration for it. She did not know what funds were used to purchase the check.

*No. 75283.* As far as she could remember, this was repayment to her for some of the funds she had advanced to Knox Steel and Wire and to her husband. She did not recall the date of the advancement, which had been made from her Oak Park bank account.

*No. 75286.* The proceeds of this check also represented reimbursement of funds advanced either to Knox Steel and Wire or Mr. Schultz. The advancements had been made at various times and she did not

remember their dates. Neither at the time she received this check, nor at the date of its issuance, did she have any idea of the amount of money she had advanced to Mr. Schultz or the amount of money he owed her. She did not know what funds had been used by Mr. Schultz to purchase the cashier's checks. She had no books or records to show the sum he owed her, and did not know if there had been any accountings between them.

No. 76994. This might have been payment for advances made by her to her husband. She never saw Mr. Schultz purchase the cashier's checks. She did not purchase these checks individually or as an employee or agent of Knox Steel.

Defendant further testified that from time to time she advanced money to Knox Steel and Wire and was reimbursed by her husband. She never received a check from Knox Steel and Wire in repayment for advances she made. The cashier's checks in question "had something to do with it, with part of the payment of all of those checks." She did not remember executing a requisition on plaintiff bank for any of these checks.

■■ This evidence is not, in our opinion, sufficient to sustain defendant's burden of proof that she had taken the checks in good faith and for value; that she had no notice of any defect in title; and that she was therefore a holder in due course. *Traders Investment Co. v. Kalas*, 246 Ill.App. 511, 517, is not a case precisely in point, but the court there commented on the character of evidence necessary to sustain such a burden of proof: "The plaintiff upon rebuttal introduced some evidence tending to show that it was a holder in due course, and it showed that it purchased the note in question on the date of its execution and paid cash for it, but how much cash is not disclosed by the evidence. It offered no evidence other than this tending to show good faith on its part. This proof did not exclude the possibility of bad faith, and one purchasing in bad faith would not be a holder in due course."

Although the trial court did make some findings that defendant had given value for the checks, its findings were not adequate to cover all of the statutory requirements just referred to, nor would they have been expected to be, because it found as a matter of law, at the close of plaintiff's case, that plaintiff had failed to prove a *prima facie* case.

Since all of the testimony on the issue of defendant's being a holder in due course was given by defendant while she was testifying as an adverse witness for plaintiff, we think that defendant should be given an opportunity to develop her own evidence in this regard. On remand, therefore, hearings should be held to determine, under the views expressed herein, whether or not defendant acquired title to the cashier's checks as a holder in due course.

The judgment of the trial court concerning the $10,200 check is affirmed. The judgment concerning the six cashier's checks is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Affirmed in part, and reversed and remanded in part.

DRUCKER and LORENZ, JJ., concur.